UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ALLIANCE INDUSTRIES, INC.,

                                    Plaintiff,

                                                          **Hon. Hugh B. Scott**

                v.
                                                          08CV490S

                                                          **Report
                                                          &
LONGYEAR HOLDINGS, INC.,                                   Recommendation**

                                    Defendant.


        This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(C)

(Docket No. 92; cf. Docket No. 16 (initial non-dispositive referral Order)).  The instant matters

before the Court are (a) plaintiff/counterclaim defendant Alliance Industries' ("Alliance") motion

for summary judgment (Docket Nos. 88[1] (amended motion), 84 (original)) and (b)

_____

        [1]Both parties submitted much of their respective moving papers to the Court under seal,
pursuant to prior Stipulation of Confidentiality, Docket No. 29; see Docket No. 30 (Order
adopting Stipulation); see also Docket Nos. 90, 98, 108 (motions to seal), 93, 99, 107 (Orders
sealing portions of moving papers).  Those documents filed under seal will be indicated in this
and the following footnote by an asterisk (*).
        In support of its motion, plaintiff Alliance submits the original motion, Docket No. 84; its
memorandum of law, Docket No. 85; the affidavit of John Walsh, vice president of human
resources and administration at the former Prosonic Corporation and current vice president of
Alliance, Docket No. 86; Alliance's counsel's joint affirmation, Docket No. 87; the amended
notice of motion, Docket No. 88; Alliance's Statement of Undisputed Material Facts, with
appendix of 38 exhibits, Docket No. 91*; its reply memorandum, Docket No. 104; and its
attorneys' joint affirmation (with exhibits), Docket No. 105.
        In response, defendant Longyear Holdings, Inc., submits (in addition to its motion papers
for its motion for summary judgment, discussed below), its memorandum of law in response to
plaintiff's motion, its response to plaintiff's statement ("Longyear's Responding Statement"), its
attorney's declaration (with exhibits), Docket No. 100*.

defendant/counterclaim plaintiff Longyear Holdings, Inc.'s ("Longyear"), motion for summary

judgment (Docket No. 95[2]).  Following referral of these dispositive motions (Docket No. 92),

responses to both motions were due by February 7, 2011, with replies due by March 7, 2011

(Docket No. 93).  Argument was held on May 25, 2011 (Docket Nos. 110, 111 (minutes); see

also Docket Nos. 102, 103, 109), and the motions were deemed submitted.

## BACKGROUND

This is a diversity stockholders' suit, alleging breaches of contract, arising from the

purchase of stock in a corporation to acquire its subsidiary and subsequent disposition of funds in

an escrow account created as part of the transaction (see Docket No. 1, Compl.).  As summarized

in an earlier motion (see Docket No. 23, Order at 2; see also Docket No. 9 (motion)), Alliance

alleged that Longyear

> "has articulated two claims against millions of dollars in escrow funds that were
> due to be released to Alliance on or about April 30, 2008.  In wrongfully asserting
> its claim to the escrow funds, the defendant has maintained that Alliance failed to
> make it aware of certain facts and information during the course of the due
> diligence phase prior to the consummation of the underlying transaction on
> December 6, 2006"

(Docket No. 11, Pl. Atty. Affirm. ¶ 7).  Longyear negotiated to acquire Alliance's subsidiary,

Prosonic Corporation ("Prosonic").  Through its attorneys, Longyear was given access to an

online "data room" of documents produced during the due diligence phase and negotiation of the

---

[2]In support of its motion, defendant Longyear submits its attorney's declaration, its
Statement of Undisputed Material Facts, with appendices of exhibits, and memorandum of law,
Docket No. 94*; its reply memorandum, its response to plaintiff's Counter-Statement
("Longyear's Reply Statement"), defense attorney's declaration (with exhibits), Docket
No. 108*.
In response (in addition to Alliance's own moving papers for its motion for summary
judgment), Alliance also submits its Counter-Statement of Material Facts ("Alliance's Counter-
Statement") and its memorandum of law in opposition to Longyear's motion, Docket No. 101*.

deal.  One set of documents disclosed that Prosonic's employee health care costs were capped at one figure but, subsequent to acquiring Prosonic, Longyear learned that Prosonic paid an employee twice the capped maximum to care for that employee's child due to a catastrophic illness.  (Docket No. 1, Compl. ¶¶ 10-12, 20, 44-52; Docket No. 12, Ans. ¶¶ 87-91, 93-95, 97, Ex. C; Docket No. 31, Pl. Atty. Aff. ¶¶ 3-7, Ex. 1; see also Docket No. 69, Order at 2.)  Alliance claims that Longyear breached the stock purchase agreement by not making a claim against an insurance policy for this loss (Docket No. 1, Compl. ¶ 48).  Alliance claims that it sustained damages and seeks specific performance and a declaration requiring release of the remainder of the deposit in the escrow account (id. ¶ 52).  Alliance claims that Longyear breached its obligation under the stock purchase agreement to notify Alliance of the Florida tax audit of Prosonic for tax years 2004 through 2006 (Docket No. 1, Compl. ¶¶ 20, 38-41, 43).

Longyear answered and asserted Counterclaims (Docket No. 12).  Longyear alleged breaches of contract as to representations of liabilities owed by Prosonic (id. ¶¶ 111-17), the existence of a "Material Adverse Effect" (as will be defined below) (id. ¶¶ 119-26), failure of Alliance to disclose actuarial and audit reports for Prosonic employee benefit plans (id. ¶¶ 128-34), failure to disclose the condition of the child of a Prosonic employee constituting an omission of a material fact (id. ¶¶ 136-40), and breach of Alliance's obligation to use its commercially reasonable efforts to do all things necessary, proper, or advisable to consummate the transaction (id. ¶¶ 142-46).  Longyear seeks to recover its attorney's fees, pursuant to the indemnity provisions of the Stock Purchase Agreement (or "Agreement") (id. ¶¶ 148-50, 186-89).  Longyear also alleges fraudulent concealment of information about that employee's child prior to the closing (id. ¶¶ 152-58), fraudulent misrepresentation of that same information (id. ¶¶ 160-67),

negligent misrepresentation (<u>id.</u> ¶¶ 169-78).  Longyear also raises breach of contract claims

regarding certain tax claims (<u>id.</u> ¶¶ 180-84).  Longyear seeks punitive damages (<u>id.</u> at page 31)

apparently arising from its tort claims (<u>see</u> Docket No. 100, Def. Memo. at 24-25).

 Alliance in turn filed its Reply to the Counterclaims (Docket No. 17).  On June 24, 2009,

Alliance then moved to amend this Reply to assert an additional affirmative defense (Docket

No. 31, Pl. Atty. Aff. ¶¶ 2, 8, 9, Ex. 2), which was granted (Docket No. 37), and Alliance filed its

amended Reply on (Docket No. 38).

 After discovery and related motion practice (<u>see</u> Docket Nos. 62, 69, 76 (Orders on

discovery motions)), plaintiff Alliance moved for summary judgment (Docket Nos. 84, 88) and

then defendant Longyear so moved for judgment in its favor (Docket No. 95).  Both parties have

submitted their statements of the material facts they deem not to be in dispute (Docket Nos. 91,

94) and counter statements responding to the opponent's statement (Docket Nos. 100, 101, 108).

*Stock Purchase Agreement*

 Pertinent to the claims and counterclaims in this action is the terms of the Agreement for

Longyear to acquire Prosonic (<u>e.g.</u>, Docket No. 91, Ex. 1, Agreement; Docket No. 94, Def.

Motion, Ex. 1, Agreement).  Section 2.1(f) of that Agreement described the disclosed liabilities

of Prosonic, with one provision providing that "There are no liabilities of [Prosonic] or any

[Prosonic] Subsidiary, except:

 ". . . (B) those arising subsequent to September 30, 2006 in the ordinary course of

 business consistent with past practice . . . ."

(Docket No. 91, Ex. 1, Agreement, Sec. 2.1(f)(ii)(B); Docket No. 91, Pl. Statement ¶ 7).  Another

section declared that from January 1, 2006, to the Closing Date of December 6, 2006, there were

no event or series of events or circumstances in existence that would have a "Material Adverse

Effect" on Prosonic (Docket No. 91, Ex. 1, Agreement, Secs. 2.1(h), 1.6(a); Docket No. 91, Pl.

Statement ¶ 8), that is "an event or circumstance that has had, or could reasonably result in, a

material adverse effect on the business or the consolidated financial condition, results of

operations or cash flow of the relevant entity . . . " (Docket No. 91, Pl. Statement ¶ 9, quoting

Agreement, Sec. 9.5).  Under Section 2.1(j)(iv), Alliance agreed to provide Prosonic's most

recent actuarial and audit reports to Longyear (id. ¶ 10, quoting Agreement, Sec. 2.1(j)(iv)) and

affirmed that none of Alliance's representations and warranties contained any untrue statement or

omission of any material fact (id. ¶ 11, quoting Agreement, Sec. 2.1(x)).  The parties further

agreed to use commercially reasonable efforts to take, or cause to be taken, such action to

execute and deliver additional documents and to do all things necessary, proper, or advisable to

consummate the transaction (id. ¶ 12, quoting Agreement, Sec. 3.3).

*Plaintiff Alliance's Motion for Summary Judgment*

Plaintiff Alliance moves for an Order granting (essentially partial) summary judgment

against Longyear (as to one major claim) and a declaration of this Court requiring immediate

release of the remaining deposit to Alliance, together with interest, the costs and disbursements

of this action and attorneys' fees and dismissing Counts I-IX of Longyear's Counterclaims

(Docket No. 88; see also Docket No. 84, original notice of motion).  Five days prior to the release

date for escrow funds, Longyear instructed its escrow agent to withhold $3.275 million; Alliance

now seeks these funds (plus interest) (Docket No. 85, Pl. Memo. at 1).  Longyear claims these

funds due to a State of Florida tax liability (the "Tax Claim") and a self-funded health insurance

expenses incurred by a Prosonic employee's child ("Prosonic Dependent") Alliance claims was
incurred post-closing ("Medical Claim") (id.).

Alliance argues that Longyear's Medical Claim lacks merit, contending that Longyear
never inquired about the health status of the employee's child (id. at 1-2) and denying that there
was a contractual duty of Alliance to disclose this information (id. at 2-4). Alliance does not
move for summary judgment as to the Tax Claim because of it believes there are triable issues of
fact from that claim (id. at 2).

Alliance denies that Prosonic had any pre-closing liability that was not disclosed to
Longyear to support its counterclaim for breach of contract (id. at 4-7), and the health care costs
in the Medical Claim arose in the ordinary course of business under the terms of
Section 2.1(f)(ii)(B) of the Stock Purchase Agreement (id. at 7-9). Alliance argues that post-
closing medical expenses were Longyear's obligation, either under its employee benefit plan or
were Longyear's responsibility for those not covered by its stop-loss policy (id. at 9-13). As for
the pre-closing medical expenses, Alliance claims that they did not have a "Material Adverse
Effect" on Longyear, in breach of Section 2.1(h) of the Agreement, thus concluding that
Longyear's second counterclaim should be dismissed (id. at 15-18).

John Walsh, Prosonic's vice president for human resources and administration during the
period leading up to the closing, stated that Alliance's standard practice prior to the closing was
to book health expenses only after expenses were actually incurred and only booked the amount
Alliance had to pay, the first $50,000 in expenses per year for each insured (Docket No. 86,
Walsh Aff. ¶¶ 1, 8-11). All other expenses were paid by Alliance's stop-loss health insurer (id.
¶ 12). Thus, in December 2006, Alliance paid $50,000 self-insurance retention for the Prosonic

employee's health expenses and all charges above $50,000 rendered in 2006 were covered by Alliance's stop-loss carrier (id.).  The policy had a $1 million maximum in coverage, and above that amount Alliance was not responsible (id. ¶¶ 14 to first ¶ 15).  Walsh also instructed Prosonic's service providers to answer any questions Longyear may have, including advising Prosonic's health insurance broker to be available to Longyear (id. ¶¶ 6, 7).  Walsh concludes that no one at Longyear asked if any Prosonic employees or dependents were in the hospital either during the negotiations and closing of the Longyear purchase, or for the year after the closing when Walsh worked at Longyear (id. ¶¶ second 15 to 16).

Longyear responds that the stop-loss insurance did not eliminate Alliance's obligation under its self-funded plan for the benefits for its employees, including the Prosonic employee (and dependent) (Docket No. 100, Def. Memo. at 3-4).

*Defendant Longyear's Motion for Summary Judgment*

In its motion, Longyear claims that this case involves two "Losses" Longyear incurred due to Alliance's breaches of the Agreement–liability under the self-funded ERISA health plan and the Florida tax liability (Docket No. 94, Def. Memo. at 1 & n.1 ("Losses" as defined term under Stock Purchase Agreement)).  First, Longyear argues Alliance breached by failing to disclose a significant health plan liability, in breach of the representations and warranties in the Stock Purchase Agreement, such as the representation that there were no undisclosed liabilities as of the date of closing (id. at 1-2).  Longyear contends that Alliance was aware of Prosonic Dependent's health claim as of the closing, and failed to disclose it to Longyear (id. at 2-3 & 2 n.2; Docket No. 94, Def. Statement Exs. 28, 81, 84).  Longyear then incurred almost $3 million

in medical costs for treatment of the employee's child for one year until the child's death (id. at 3).

Longyear next contends that Alliance failed to pay taxes owed by Prosonic in Florida from 2004-06, despite Alliance's agreement in the Agreement to be responsible for payment of all taxes Prosonic owed (id.). Longyear incurred $516,646.53 as a result (id.; Docket No. 94, Def. Statement ¶ 157).

Under the Agreement, Longyear claims that Alliance agreed to indemnify and hold harmless Longyear for any "Losses" arising out of Alliance's breaches (Docket No. 94, Def. Memo. at 5; Docket No. 94, Def. Statement, Ex. 1, Agreement § 6.1; see also Docket No. 91, Pl. Statement, Ex. 1, Agreement). Longyear now calculates those losses total $4,285,602; of which health claims were $2,916,053, and the tax liability was $516,646, plus attorney's fees and expenses incurred in investigating and prosecuting these claims (including fees incurred in this action) (Docket No. 94, Def. Memo. at 5). Longyear seeks a declaration that it is entitled to the $3.275 million remaining with the escrow agent and the balance of $1,010,602 from Alliance (id.).

## DISCUSSION

I.      Applicable Standards

    A.      Summary Judgment

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003); Fed. R. Civ. P. 56(a) (effective

Dec. 2010).  The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.  In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. Ford, supra, 316 F.3d at 354.  "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1535 (2d Cir.) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)), cert. denied, 522 U.S. 864 (1997).  While the moving party must demonstrate the absence of any genuine factual dispute, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), the party against whom summary judgment is sought, however, "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (emphasis in original removed); McCarthy v. American Intern. Group, Inc., 283 F.3d 121, 124 (2d Cir. 2002); Marvel Characters v. Simon, 310 F.3d 280, 285-86 (2d Cir. 2002).  The opponent to summary judgment may argue that he cannot respond to the motion where it shows, by affidavit, "that, for specified reasons, it cannot present facts essential to justify its opposition," Fed. R. Civ. P. 56(d).

The Local Civil Rules of this Court require that movant and opponent each submit "a separate, short, and concise" statement of material facts, and if movant fails to submit such a statement it may be grounds for denying the motion, W.D.N.Y. Loc. Civ. R. 56(a)(1), (2) (effective Jan. 1, 2011).  The movant is to submit facts in which there is no genuine issue, id. R. 56(a)(1), while the opponent submits an opposing statement of material facts as to which it is

9

contended that there exists a genuine issue to be tried, id. R. 56(a)(2).  Each numbered paragraph

in the movant's statement will be deemed admitted unless specifically controverted by a

correspondingly numbered paragraph in the opponent's statement, id.  Each statement of material

fact is to contain citations to admissible evidence to support the factual statements and all cited

authority is to be separately submitted as an appendix to that statement, id. R. 56(a)(3).

Both sides here have submitted extensive statements of material fact, responding

statements and even reply statements, including voluminous exhibits.

B.      Choice of Law

Pursuant to the terms of the Stock Purchase Agreement (Docket No. 91, Pl. Statement,

Ex. 1, Stock Purchase Agreement § 9.10; see also Docket No. 94, Def. Statement, Ex. 1, Stock

Purchase Agreement § 9.10), New York law applies (Docket No. 85, Pl. Memo. at 3. n.2; see

Docket No. 94, Def. Memo. at 15-16).  For a contract claim, the parties' choice of law applies,

Hartford Fire Ins. Co. v. Orient Overseas Container Lines (UK) Ltd., 230 F.3d 549, 556 (2d Cir.

2006) (Docket No. 85, Pl. Memo. at 3 n.2).  In this removed diversity action, it is uncontested

that New York substantive law is applicable, see Johnson v. The Bon-Ton Dep't Stores,

No. 05CV170, 2006 U.S. Dist. LEXIS 75671, at *9-11 (W.D.N.Y. Oct. 16, 2006) (Scott, Mag.

J.) (applying New York law to accident in this district involving New York plaintiff and

Pennsylvania retailer defendant); Allegany Co-Op Ins. Co. v. Dimora, 669 F. Supp. 2d 316, 318

(W.D.N.Y.) (Scott, Mag. J.), adopted, 669 F. Supp. 2d 315 (W.D.N.Y. 2009) (Arcara, J.).

As for Longyear's fraud claims, the choice of law analysis is governed by New York

State interest analysis, where Ohio or New York law may be pertinent (see Docket No. 85, Pl.

Memo. at 25 n.24).

C.      New York Substantive Law–Breach of Contract

Under New York law, the elements of breach of contract are the existence of a contractual

duty, performance by plaintiff, breach by defendant, and damages arising from that breach, see

Terwilliger v. Terwilliger, 206 F.3d 240, 246 (2d Cir. 2000) (Docket No. 85, Pl. Memo. at 3);

Armstrong Pump v. Hartman, No. 10CV446, 2010 U.S. Dist. LEXIS 107357, at *10 (W.D.N.Y.

Oct. 10, 2010) (Skrenty, Ch. J.) (Docket No. 94, Def. Memo. at 16 n.9); see Furia v. Furia,

116 A.D.2d 694, 498 N.Y.S.2d 12 (2d Dep't 1986) (id. at 16).

Longyear alleges tort claims.  The choice of law analysis becomes more involved.

Applying the forum New York State's choice of law regime for torts, there has to be a weighing

of the interests of the jurisdictions whose law could apply (New York (forum jurisdiction), Ohio

(Alliance state of incorporation and domicile), Utah (Longyear's place of domicile), Delaware

(Longyear's state of incorporation)), after determining that a conflict exists between these

jurisdictions' laws (see Docket No. 85, Pl. Memo. at 25 n.24).  As noted by Alliance (id.), the

alleged tortious acts occurred in Ohio, thus if New York law does not apply, Ohio law would

(id.; cf. Docket No. 101, Pl. Memo. at 20 n. 15 (noting that Longyear did not address the choice

of law issue)).

II.      Application

Alliance's arguments at their core dispute that any information was hidden from Longyear

regarding employee health benefits.  Either this information was available for Longyear to

discover in its due diligence or Alliance was not obliged under the Stock Purchase Agreement to

disclose it.  Alliance refutes Longyear's counterclaims arising from the Prosonic employee's

health coverage and seeks summary judgment and specific performance of the escrow agreement.

11

A.      Medical Claim

The issues arising under this claim are whether the Medical Claim was disclosed to Longyear or available for Longyear to learn in the due diligence phase of the negotiation; and whether Alliance owed Longyear any duty to disclose this claim.

1.      Whether Alliance Disclosed

Alliance represented that there were no liabilities of Prosonic.  Alliance believes that either there was no pre-closing loss to Prosonic because of its stop-loss coverage or any loss occurred post-closing and was not Alliance's (or Prosonic's) responsibility.

To understand the stop-loss coverage argument, stop-loss coverage needs to be defined. "Stop-loss insurance is an insurance policy for losses that the insured self-insures up to the limit of the deductible."  Edstrom Indus. v. Companion Life Ins. Co., 516 F.3d 546, 551 (7th Cir. 2008), overruled in part on other grounds as stated in Raymond Mgmt. Servs. v. William A. Pope Co., 397 B.R. 414, 431 (Bankr. N.D. Ill. 2008); see also Tactical Stop-Loss LLC v. Travelers Cas. & Sur. Co. of Am., 2010 U.S. Dist. LEXIS 70393 (W.D. Mo. July 14, 2010) ("Stop-loss insurance is excess health care coverage which allows employers to self-insure a retention amount for the first portion of each individual employee's health care coverage and purchase excess health care coverage for the portion above the self-insured retention.") (Docket No. 85, Pl. Memo. at 6).  But as operator of a self-funded plan, the employer remains liable despite purchasing stop-loss insurance to reimburse it, American Med. Sec. Inc. v. Bartlett, 111 F.3d 358, 364 (4th Cir. 1997) (Docket No. 100, Def. Memo. at 3-4).

Alliance contends that it self-insured (as Longyear self-insures) for the first $50,000 of health expenses per year (or "SIR") per insured employee, with the excess covered by stop-loss

insurance up to $ 1 million.  Any expenses beyond $1 million were not Alliance's responsibility.
(Docket No. 85, Pl. Memo. at 6.)  Since this was not a present obligation to pay, Alliance
concludes that there was no "liability" that needed to be disclosed (id. at 5-7).

Longyear responds that Alliance was liable for its self-funded health plan, despite the fact
that it obtained insurance to cover some of that plan (Docket No. 100, Def. Memo. at 6-7).

Alternatively, Alliance argues that, if deemed liabilities, these medical expenses were
incurred after September 30, 2006, in the ordinary course of business and are "liabilities"
recognized in the Stock Purchase Agreement as exceptions from Alliance's warranties about
undisclosed liabilities (Docket No. 85, Pl. Memo. at 7).  Longyear counters that the expenses
were incurred at the Prosonic Dependent's birth, in September 6, 2006, and that the loss was not
in Prosonic's ordinary course of business (Docket No. 100, Def. Memo. at 8).

### 2.    Whether Information Was Readily Available to Longyear

Alliance alternatively argues that whatever information Prosonic and its contractors had
about the insured's medical claim were made available to Longyear in the due diligence process
(Docket No. 85, Pl. Memo. at 8).  Alliance put in its books the $50,000 per insured employee and
not amounts in excess of that amount that may have been incurred in a given year, since the
amounts above $50,000 either were covered by stop-loss coverage or exceeded Alliance's
coverage entirely (id. at 9).

### 3.    Whether Alliance Owed Duty to Longyear to Disclose

Alliance next argues that there was no "Material Adverse Effect" on the value of Prosonic
by the Medical Claim (Docket No. 85, Pl. Memo. at 15-18; Docket No. 104, Pl. Reply Memo. at
3-6) so as to require it to disclose this claim to Longyear.  As previously stated, Alliance's

13

liability was limited to $50,000 generally, or $50,000 for the Prosonic dependent at issue here plus up to $480,000 in stop-loss coverage (Docket No. 85, Pl. Memo. at 16).  When compared with the purchase price of Prosonic, these amounts for the dependent's health care are not material to the value of Prosonic (id. at 17).  The excess amounts in the millions of dollars occurred in 2007, post-closing and even adopting Longyear's asserted total expenses of $2.9 million, that was less than 5% of the value of Prosonic (id. at 17 & n.17).

        4.        Issue of Material Fact

These three issues above rest upon the nature of "self-insurance" for employee benefit plans and the arrangements made by Alliance and Longyear for this coverage.

The parties differ on the fundamental nature of "self-insurance" when part of that coverage is funded by a third party source.  Alliance, claiming that its benefits are "self-insured," views its obligation as limited to the coverage amount of $50,000 per employee, with amounts above that figure (up to the policy maximum) being covered by its stop-loss insurer.   Any excess in any given year would have the covered person "lasered," that is the stop-loss insurer would increase the deductible for that employee in the following year (Docket No. 85, Pl. Memo. at 5-7).

On the other hand, Longyear views the self-insurer as just that, the employer is responsible for the entire coverage of the employee's health claims in the first instance, where excess amounts may be reimbursed by a stop-loss insurer pursuant to the terms of the stop-loss policy, but the insured under that stop-loss policy still remains responsible for the health benefits under the insured's self-insurance benefits plan, see American Med Sec., supra, 111 F.3d at 364.  Longyear views being "self-insured" as a term of art with only one meaning.

14

This difference is reflected in the terms they use to describe the stop-loss coverage; Alliance calls it insurance (see, e.g., Docket No. 91, Pl. Statement ¶ 25) while Longyear calls it "reinsurance" (e.g., Docket No. 94, Def. Statement ¶ 144), cf. 43 Am. Jur. 2d, Insurance § 1809 (2011) (definition of reinsurance, an arrangement under which an insurance company buys insurance from another company to assure some of its risks, where one party agrees to indemnify another, either in whole or in part, against loss), with Alliance objecting to that characterization (e.g., Docket No. 101, Alliance's Counter-Statement ¶ 144).

These differing views of the parties color how they each view the representations Alliance made, its disclosure obligations, and the due diligence performed regarding disclosure of health related expenses for the closing.  Alliance needed to know the number of times it had to pay $50,000 for each employee (and such employees that may have been lasered to a different amount), while Longyear needed to know how much any particular employee may claim for coverage.  Thus, there is an issue of fact whether Alliance's disclosure of the aggregate amounts claimed and paid (by Alliance's stop loss insurer) and representing that no liabilities exist (beyond the $50,000 per employee) satisfied the terms of the Agreement regarding liability representations.  Viewed another way, there is an issue of fact whether Longyear applied due diligence in not testing Alliance's perception of its expenses with Longyear's perception.  This difference in views also affects what constituted a "liability" under the Agreement; to Alliance, these employee benefit expenses beyond $50,000 are not liabilities since any amount above that figure is reimbursed simultaneously with it being incurred, hence it did not remain as a "liability" on Alliance's books, while Longyear needed to know the amounts paid in employee claims and

15

potential employee claims going forward (despite whatever reimbursement arrangement may have been in place).

　　This leads to issues of material fact that preclude summary judgment.  The parties conducted due diligence as to Prosonic/Alliance's operations and not on Longyear's operations.  The Agreement called upon Alliance to make representations as to Prosonic's obligations.  Longyear argues that the representations and warranties under the Agreement include medical expenses and claims against Alliance (see Docket No. 100, Longyear's Responding Statement ¶ 14).  But, given the stop-loss coverage arranged by Alliance, its unreimbursed exposure (the one directly disclosed) was only $50,000 per employee.  Anything beyond that was covered by stop-loss coverage (Alliance's filed claims coupled with the policy's simultaneous reimbursement provision of the policy, described below).

　　What is not in this record is any documentation of Alliance paying the medical expenses of a Prosonic employee (or his or her dependent), as required by the Fidelity stop-loss policy in order to be reimbursed by Fidelity.  In its due diligence Alliance presented copies of the employee benefit plan, the aggregate reports of amounts paid (see Docket No. 91, Pl. Statement ¶¶ 47-59) showing claims incurred by Alliance and those claims paid by Fidelity (Docket No. 91, Ex. 22).  There is no separate set of documents within the due diligence production that showed that Alliance paid the medical expenses of its employees or their dependents that were later reimbursed by Fidelity or included as part of the annual deductible.  The closest documentation to amounts paid for an employee's claims is Alliance's detailed check register for payments made for the Prosonic Dependent's care (Docket No. 91, Ex. 17).  But from the motion papers, it is not clear whether this register was disclosed as part of the due diligence.  A cursory review of

the disk containing the documents produced during due diligence (Docket No. 91, Ex. 9) does not show that this register was included in the production of the over 17,000 pages of documents produced (Docket No. 91, Pl. Statement ¶ 44).  Furthermore, that due diligence contained documents up to November 2006 and the Prosonic Dependent's expenses only began to be received by that month.  As indicated in the record, Alliance produced documents at the request of Longyear and made available Alliance's health insurance broker and the administrator of its health benefits plan, but Longyear apparently never availed itself to contact either the broker or the administrator (Docket No. 101, Alliance's Counter-Statement ¶ 40).  While Longyear, in reply, argues that the information was exclusively in the control of Alliance or its agents (Docket No. 108, Longyear's Reply Statement ¶ 40), Longyear does not comment on whether or not it contacted these agents, made available by Alliance, for the purpose of advancing the due diligence production.  Longyear claims that it made repeated attempts to obtain information about health claims over $50,000 and Alliance failed to disclose them (Docket No. 108, Longyear's Reply Statement ¶ 7) on an individual basis or disclose about the Prosonic Dependent (id.).

The aggregate reports document payments made up to August 31, 2006 (see id. ¶ 53; Docket No. 91, Ex. 22), while Alliance learned of the Prosonic Dependent and potential medical claims in October 2006 (see Docket No. 91, Pl. Statement ¶¶ 53, 33; Docket No. 91, Ex. 22). There is an added material issue of fact of what documents, if any, Alliance provided regarding the Prosonic Dependent's medical expenses as Alliance learned of them through the closing date of December 6, 2006.

Fidelity's stop-loss policy clearly states that one of the duties of the Employer (here Alliance) was to pay "all eligible claims under the Plan within thirty days from the date adequate proof of claim is provided to the Employer" in order to satisfy the deductible or be reimbursed (Docket No. 91, Ex. 12, at pages 9, 2 of 16, <u>see also</u> <u>id.</u> at pages 2, 8 of 16 (defining "Employer" and "Participating Employer," here Alliance). The policy is an "EXCESS LOSS REIMBURSEMENT CONTRACT" (<u>id.</u> at page 2 of 16), with an aggregate percentage reimbursable of 100% after the $50,000 minimum annual aggregate deductible has been paid (<u>id.</u> at page 4 of 16). The policy, however, has a provision for simultaneous reimbursement for certain large claims (over $5,000) that met other conditions (<u>id.</u> at pages 5-6 of 16). Thus, for these large claims, any payments out by Alliance would be a wash since Alliance would be reimbursed as it made payments.

Longyear did not have the same stop-loss coverage as Alliance had. In fact, after the acquisition Longyear negotiated stop-loss policy with Aetna (Docket No. 94, Ex. 38) which included an exclusion for certain dependents of Prosonic employees who are hospitalized as of or just prior to the effective date of that policy (Docket No. 94, Def. Statement ¶ 146). That exclusion applied to the Prosonic Dependent (<u>id.</u> ¶ 147). It does not appear that Longyear had an equivalent to the simultaneous reimbursement provision that Alliance had with its Fidelity policy (<u>cf.</u> Docket No. 94, Ex. 38, Aetna Stop Loss Policy Section 5, "Conditions," stop loss payment provision). Thus, Longyear entered into different terms for its stop-loss coverage. Longyear needed information about its exposure from each Prosonic employee since it would pay out, as self-insurer, the full amount of qualified employee claims and seek stop loss coverage for them in a separate transaction. Instead, Alliance produced its aggregate payments for claims made and

reimbursement received from its stop-loss carrier while affording Longyear access to its broker and administrator.  Whether this is sufficient raises fact issues.

Both parties' motions for summary judgment regarding the contract claims should be **denied**.

       5.    Tort Claims

          a.    Substantive Claims

Longyear also seeks summary judgment on its tort claims for fraudulent concealment and fraudulent misrepresentation, as well as its breach of contract claims (see Docket No. 94, Def. Memo. at 34 n.24; Docket No. 108, Def. Reply Memo. at 10; see also Docket No. 100, Def. Memo. at 21-23, 23-24).  Alliance first argues that Longyear errs in the choice of substantive law for these tort claims and that Longyear should not prevail under either New York or Ohio law (Docket No. 101, Pl. Memo. at 19-21; Docket No. 104, Pl. Reply Memo. at 11-15).  Longyear's tort claims also turn upon the differing perception issue discussed above surrounding its contract claims; Longyear claims that Alliance failed to disclose information about the escalating health claims of the Prosonic Dependent, which gave Alliance superior knowledge from Longyear, and thus established an obligation on Alliance's part to make a full, unambiguous disclosure of these facts (see Docket No. 100, Def. Memo. at 21-23).

Since there is no conflict between New York and Ohio law on the requirement for a negligent misrepresentation claim that the party establish the existence of a special relationship (see Docket No. 104, Pl. Reply Memo. at 14-15) or the requirement of a fiduciary relationship in order to establish a fraudulent concealment claim (see Docket No. 101, Pl. Memo. at 19), the Court need not identify, at this juncture, which jurisdiction's law applies.

Under either jurisdiction's substantive law, Longyear fails to establish a fiduciary relationship existed between these parties to create a tort duty to disclose material information to establish a fraud claim, separate from whatever contractual duty to disclose may have existed under the Agreement, see SNS Bank, N.V. v. Citibank, N.A., 7 A.D.3d 352, 356, 777 N.Y.S.2d 62, 66 (1st Dep't 2004); Gator Dev. Corp. v. VHH, Ltd., Appeal No. C-080193, 2009 Ohio App. LEXIS 1525, at *17 (Ohio Ct. App. Apr. 17, 2009) (Docket No. 101, Pl. Memo. at 19). Longyear argues that the "special facts" doctrine (under New York law) arose here establishing a duty upon Alliance to disclose facts with which it had superior knowledge, and that failure to disclose would render the transaction inherently unfair, see Swersky v. Dreyer & Traub, 219 A.D.2d 321, 327-28, 643 N.Y.S.2d 33, 37 (1st Dep't 1996) (Docket No. 100, Def. Memo. at 22).  As discussed above, the fact of one employee's dependent's extensive medical claims became an issue because of how Longyear handled coverage of such claims after the closing of the deal and the difference in stop-loss coverage Longyear had (or was to have) from that of Alliance and Prosonic's coverage.  That fact was not necessarily material at the time of the closing, where the exposure was less than 5% of the purchase price, see ECA & Local 134 IBEW Jt. Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 204 (2d Cir. 2009) (setting forth bright line 5% threshold for assessing the materiality of alleged misstatement) (see also Docket No. 85, Pl. Memo. at 17 & n.17 (calculating asserted medical expenses as 4% of value of Prosonic)).

Thus, so much of plaintiff Alliance's motion for summary judgment rejecting defendant Longyear's tort claims should be **granted**.

b.      Punitive Damages

Given the recommendation above to deny Longyear judgment on its tort claims, Longyear is **not entitled to punitive damages** arising from these tort claims (see also Docket No. 85, Pl. Memo. at 32, 33-35; Docket No. 104, Pl. Reply Memo. at 15).

B.      Florida Tax Claim

As for the Florida Tax Claim, Alliance claims that there are material issues of fact precluding summary judgment (Docket No. 85, Pl. Memo. at 2; Docket No. 87, Pl. Attys' Jt. Affirm. ¶ 4; Docket No. 101, Pl. Memo. at 21-23).   Alliance asserts that Longyear did not provide the notice of the Tax Claim as required by the Agreement (Docket No. 101, Pl. Memo. at 22, citing Agreement §§ 9.3, 8.4.   The notice first came to Prosonic from the Florida taxing authorities which it forwarded to Longyear, pursuant to the terms of the Transition Services Agreement (Docket No. 91, Ex. 6; Docket No. 101, Pl. Memo. at 22).   According to Alliance, Longyear was to then notify Alliance of the tax claim that it forwarded to Longyear (Docket No. 101, Pl. Memo. at 22).   Alliance concludes that the nature and extent of its prejudice from Longyear's failure to formally notify Alliance is a material issue of fact to preclude summary judgment (id. at 23).   Longyear counters that, first, formal notice was not required under the Agreement and, if it was deemed to be required, that the notice sent on April 25, 2008, constitutes that notice (Docket No.108, Def. Reply Memo. at 8-9).

Under the Agreement, Longyear as the "Buyer" was to notify Alliance, the "Seller," in writing "upon receipt by Buyer or any Affiliate of Buyer of any notice of any inquiry, assessment, claim, demand, charge, complaint, action, suit, proceeding, hearing, audit or investigation . . . with respect to Taxes of the Company" (Docket No. 91, Ex. 1, Agreement Sec. 8.4, Sec. 9.3

(address for "all notices" to Seller[3]); see Docket No. 101, Pl. Opposition Memo. at 22).  "No delay on the part of Buyer in notifying Seller shall relieve Seller from any obligation hereunder except to the extent that Seller is prejudiced thereby" (Docket No. 91, Ex. 1, Agreement Sec. 8.4; see Docket No. 101, Pl. Opposition Memo. at 22).  The notice provision of Section 9.3 does not distinguish between tax notices under Section 8.4 and other notices that require formal presentation (cf. Docket No. 108, Def. Reply Memo. at 8, arguing that "The Agreement does not state that Longyear must provide contractual 'Notice' of such an audit"), although Section 9.3 expressly refers to "all notices, requests, claims, demands, and other communications under this Agreement."

Whether Alliance received formal notice (as required by Agreement Secs. 8.4 and 9.3), whether such notice was required under the terms of the Agreement or was timely, whether the actual notice received by Prosonic from the Florida tax authorities and later forwarded to Longyear constitutes "formal notice" under the terms of the Agreement, and whether Alliance was prejudiced by the method by which it ultimately received notice of the Florida tax audit to hold Alliance liable for the pre-Closing tax liability asserted in the notice are all material issue of fact.  Summary judgment is not appropriate for the Tax Claim and, thus, defendant's motion for summary judgment as to that claim (Docket No. 95) should be **denied**.

---

[3]The seller's contractual address before the closing was either to Prosonic or to Alliance to the attention of R. John Lehman, with copies to Alliance's law department and to its outside counsel, Jones Day, Docket No. 91, Ex. 1, Agreement Sec. 9.3.

**CONCLUSION**

Based upon the above, it is recommended that plaintiff Alliance Industries' amended

motion for summary judgment (Docket No.  88) be **denied in part** (as to the material issues of

fact arising from the contract claims for the Medical Claim) and **granted in part** (solely on

denying defendant Longyear Holdings' judgment on its tort claims) and its earlier motion for

similar relief (Docket No. 84) be **terminated as moot**; and defendant's motion for summary

judgment (Docket No. 95) be **denied**.


Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report &

Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the

Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk**

**of this Court within fourteen (14) days after receipt of a copy of this Report &**

**Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b) (effective**

**December 1, 2009) and W.D.N.Y. Local Civil Rule 72.3(a).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION**

**WITHIN THE SPECIFIED TIME OR TO REQUEST AN EXTENSION OF SUCH TIME**

**WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT DISTRICT COURT'S**

**ORDER ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.**  Thomas v.

Arn, 474 U.S. 140 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d Cir. 1995); Wesolak

v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The District Court on <u>de novo</u> review will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance.  <u>See</u> <u>Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.</u>, 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Civil Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **<u>Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.</u>**

SO ORDERED.

<u>/s/ Hugh B. Scott</u>
Hon. Hugh B. Scott
United States Magistrate Judge

Dated: Buffalo, New York
      August 3, 2011