UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ALLIANCE INDUSTRIES, INC.,

Plaintiff / Counter-Defendant,

v.

**DECISION AND ORDER**
08-CV-490S

LONGYEAR HOLDINGS, INC.,

Defendant / Counter-Plaintiff

## I. INTRODUCTION

Plaintiff, Alliance Industries, Inc. ("Alliance") commenced this diversity action on July 2, 2008 alleging, *inter alia*, that Defendant Longyear Holdings, Inc., ("Longyear") unlawfully withheld funds from an escrow account pursuant to the sale of Alliance's subsidiary, Prosonic Corp. ("Prosonic"). Longyear answered and asserted eleven counterclaims, alleging that it withheld the funds because Alliance breached the Stock Purchase Agreement ("Agreement"), which memorialized the sale. Each party eventually moved for summary judgment. (Docket Nos. 88, 95.) The Honorable Hugh B. Scott, United States Magistrate Judge, entered a Report and Recommendation advising this Court to grant in part and deny in part Alliance's motion for summary judgment and to deny in full Longyear's motion. (Docket No. 112.) Presently before this Court are each party's timely objections to that Report and Recommendation. (Docket Nos. 116, 121.) For the following reasons, the Report and Recommendation is set aside in part and adopted in part.

## II. BACKGROUND

### A. Facts

This action arises from complications surrounding Longyear's full stock purchase of Alliance's subsidiary, Prosonic Corp., for $72.5 million. (Plaintiff's Statement of Facts ("Pl.'s State.," ¶ 1; Docket No. 91.)[1] That purchase was finalized December 6, 2006 by the Agreement. (Id., ¶ 5.)

#### 1. Infant's Medical Claim

In the Agreement, each party agreed that upon the completion of the stock transfer, Prosonic's employees and their accompanying health coverage would also transfer to Longyear. (Defendant's Statement of Facts ("Def.'s State."), ¶ 141.) Longyear self-funded its employees' health insurance, meaning that it provided health coverage directly to its employees with its own funds. ((Pl.'s State.¶ 22.) Alliance did have a "stop-loss" insurance policy, however. (Id., ¶ 25. ) Under its stop-loss policy, Alliance was responsible for the first $50,000 of any health insurance claim, while its insurance provider was responsible for the remainder, up to $1 million.[2] (Id.)

In September of 2006, a Prosonic employee, covered by Alliance's health insurance, had a child who was born with serious medical ailments.[3] (Id., ¶ 30.) Tragically, the child

---

[1]This Court has accepted facts in each party's statement of facts to the extent that they have not been controverted by the opposing party. See Local Rule 56(a)(2) (statements not specifically controverted are deemed admitted).

[2]After an employee amassed over $1 million in claims, his health coverage ceased. (Pl.'s State., ¶ 23.) In other words, $1 million was the maximum amount of coverage for an Alliance employee and his family.

[3]For privacy reasons, this Court will refer to the child simply as the "child" or "infant."

never recovered from these birth defects, and after several months in the hospital, died in December of 2007. (Id.; Def.'s State., ¶ 150.)[4] According to Longyear, the total medical costs, which ultimately became it's responsibility, amounted to nearly $3 million.[5] (Def.'s State., ¶¶ 142, 149). Longyear had its own insurance policy for these employees, which became effective January 1, 2007. (Id., ¶ 146.) But this policy did not cover the infant's claim because it excluded any dependant of an employee who was already hospitalized at the time the policy began. (Id., ¶ 146-147.)

Alliance learned of the child's birth in October of 2006 and by November, it was aware that the medical costs had exceeded $400,000. (Pl.'s State., ¶¶ 33, 37; Def.'s State., ¶ 107.) However, it did not affirmatively disclose this event as a liability during the purchase negotiations or due diligence period because it was covered by its stop-loss insurance. (Pl's State., ¶ 25.) Pursuant to Alliance's standard accounting practice, health benefit related costs were not booked until the expense was actually incurred. (Id., ¶ 29.) In this case it booked $50,000, but nothing over that amount because its insurance provider covered the remainder. (Id., ¶¶ 28, 41, 42.) Alliance, however, did disclose a 2006 aggregate report of health care related liabilities, in addition to a description of the plan with its $50,000 initial liability, as outlined above. (Id., ¶¶ 48-51.) Alliance further provided access to an Internet-based "data room," containing over 17,000 pages of documents, and further advised Longyear that it could contact Alliance's health insurance broker and its

---

[4]Defendant's Statement is not docketed on CM/ECF. It is maintained in paper form only in the Clerk's Office at the Western District of New York.

[5]Alliance objects to this figure on hearsay grounds. But because this allegation serves as the basis for the litigation, it is included for informational purposes.

health benefit plan's third-party administrator with questions. (Id., ¶ 64; Def's State., ¶ 9.)

However, believing that Alliance's failure to disclose the infant's medical claim violated the Agreement, on April 25, 2008, four months after the deal closed, Longyear notified Alliance that it breached the Agreement and instructed the escrow agent to withhold $3.4 million of the deposit. (Def's State., ¶ 92) According to Longyear, $2.9 million of this accounted for medical costs relating to the infant. (Id., ¶ 95).

Alliance contends that it did not breach the Agreement and brought this action to recover the withheld funds. Longyear then asserted several breach-of-contract and tort counterclaims.

**2. Tax Claim**

Unrelatedly, on April 17, 2007, Alliance received notice that the State of Florida intended to audit Prosonic's books for the period ranging from January 1, 2004 to December 31, 2006. (Def's State., ¶ 151.) Alliance then forwarded this letter to Longyear. (Id., ¶ 154.) Florida ultimately assessed Prosonic $513,787.53 in taxes for the aforementioned period. (Id., ¶ 157.) According to the Agreement, all pre-closing tax liabilities were Alliance's responsibility. (Agreement, § 8.1(a); Docket No.1-2.) Yet, claiming it was prejudiced by a delay in notice, Alliance refused to pay this tax liability. (Id., ¶ 177.) This presumably accounts for the remainder of the withheld funds in escrow.

**B. The Agreement**

Longyear's counterclaims allege several violations of the Agreement, specifically Sections 2.1(f)(ii), 2.1(h), 2.1(j)(i)-(vi), 2.1(x), 3.3, and 8.1(a). It also relies on Sections 6.1 and 6.4(d) to support its arguments. Those sections, in relevant part, are set forth below.

**§ 2.1(f)(ii)**:
There are no liabilities of [Prosonic] or any [Prosonic] Subsidiary, except: . . . (B) those arising subsequent to September 30 2006, in the ordinary course of business consistent with past practice.

**§ 2.1(h):**
During the period commencing January, 1, 2006 to and including the Closing Date [December 6, 2006], (i) there has not occurred any event or series of events, and there are not facts or circumstances in existence which would have a Material Adverse Effect on the Company.

**§ 2.1(j)(i)-(vi):**
[Alliance disclosed a] current, correct and complete list of all . . . employee benefit plans . . . [and] the most recent annual financial report. . .[and] . . . actuarial report, if any."

**§ 2.1(x):**
None of the representations and warranties of [Alliance] set forth in this Agreement, including the [Pronsic] Disclosure Letter . . . contains or will contain any untrue statement of material fact required to be stated therein in order to make such representations and warranties not misleading.

**§ 3.3:**
Subject to the terms and conditions herein provided, each of the Parties shall use its commercially reasonable efforts to take, or cause to be taken, such action, to execute and deliver, or cause to be executed and delivered, such additional documents and instruments, and to do, or cause to be done, all things necessary, proper, or advisable under the provisions of this Agreement and under applicable law to consummate and make effective the transactions contemplated hereby and by the other documents executed and delivered in connection herewith.

**§ 6.1:**
After the Closing Date [December 6, 2012] and subject to limitations . . . [Alliance] . . . shall indemnify and hold harmless [Longyear] . . . against any and all damages resulting from . . . any breach . . . by [Alliance].

> **§ 6.4(d):**
> [T]his Agreement shall be read and interpreted as if the terms "material" and "Material Adverse Effect" and words of similar meaning were not contained, set forth, or otherwise included, directly or indirectly, in such representations, warranties and covenants.
>
> **§ 8.1(a):**
> Alliance shall be responsible for the payment of all Taxes of [Prosonic] . . . that are owned [sic] with respect to the Pre-Closing Tax Period.

### C. Procedural History

Alliance commenced this action on July 2, 2008 by filing a complaint in this Court. (Docket No. 1.) Defendant answered and asserted counterclaims on August 22, 2008. (Docket No. 12.) This matter was referred to Judge Scott for pretrial matters on September 4, 2008 (Docket No. 16) and later this Court designated him to report on all dispositive motions (Docket No. 92).

Alliance initially moved for summary judgment on December 20, 2010 (amending the motion later that day) and Defendant moved likewise on December 29, 2010. (Docket Nos. 84, 88 (amended motion), 95.) On August 3, 2011, Judge Scott issued a Report and Recommendation advising that Alliance's motion for summary judgment be granted in part and denied in part and that Longyear's motion be denied in full. (Docket No. 112.) After receiving leave to extend the time to file objections (Docket No. 114), Alliance filed objections on September 14, 2011. (Docket No. 116.) Longyear filed its objections on September 28, 2011. (Docket No. 121.)

## III. DISCUSSION

### A. Standard of Review

This Court reviews specific objections to reports and recommendations *de novo*. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). When only a general objection is made to a portion of a magistrate judge's report and recommendation, district courts subject that portion of the report and recommendation to a clear error review. Fed. R. Civ. P. 72(b)(2)-(3). District courts, however, are not required to review the factual findings or legal conclusions of the magistrate judge as to which no proper objections are interposed. Ianniello v. Hartford Life & Acc. Ins. Co., No. 10-CV-370, 2012 WL 314872, at *1 (E.D.N.Y. Feb. 1, 2012) (citing Thomas v. Arn, 474 U.S. 140, 150, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985). Ultimately, this Court may accept, reject, or modify any of the Magistrate's findings or recommendations. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

### B. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" only if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. In determining whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion." Adickes v. S. H. Kress & Co., 398 U.S. 144, 158–59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970) (internal quotations and

citation omitted).

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir. 2004) (citations omitted). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

When the parties cross-move for summary judgment, "the standard is the same as that for individual motions for summary judgment." Natural Res. Def. Council v. Evans, 254 F. Supp. 2d 434, 438 (S.D.N.Y.2003). "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." Id. (citing Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)).

**C. Review of the Report and Recommendation: Breach of Contract – Infant's Medical Expenses**[6]

As noted by Judge Scott, the heart of this dispute is the parties differing views regarding the calculation of liabilities – a term which is undefined in the Agreement. Alliance asserts that it had no liabilities and thus it did not breach the Agreement. Longyear

---

[6]Because the Agreement's choice-of-law provision calls for the application of New York law for all contract claims, that state's law will be applied by this Court. See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 n. 7 (2d Cir. 2005) ("New York law gives full effect to parties' choice-of-law provisions.") (Internal citation and quotation marks omitted.)

disagrees and argues that Alliance, by representing that it had no liabilities, breached the Agreement.

Judge Scott found that (1) the adequacy of Alliance's disclosure and (2) the accuracy of its representation that it had no liabilities were questions of fact that should be left to the jury. (See Report and Recommendation, p. 15; Docket No. 112.) Bolstering this finding, he concluded that "there is an added material issue of fact of what documents, if any, Alliance provided regarding the [infant's] medical expenses as Alliance learned of them." (Id., p. 17.)

Alliance filed objections, contending that Judge Scott (1) failed to address its argument that there was no causal relationship between the alleged breach and the claimed damages; (2) failed to address whether Alliance had a duty to disclose at all, rendering any discussion about the scope of its disclosure premature; and (3) erred in finding issues of fact regarding the sufficiency of disclosure.

Longyear also filed objections. It argues that Judge Scott (1) failed to apply settled law relating to "liabilities"; (2) improperly conflated contractual representations with pre-contract disclosures; (3) incorrectly applied the law relating to a buyer's duty to investigate the seller's representations; (4) misstated certain undisputed facts; and (5) made incorrect findings of fact.

Both parties object on the ground that Judge Scott did not specifically address Longyear's allegations that Alliance breached several other Agreement provisions, including Sections 2.1(h), 2.1(j)(i)-(vi), 2.1(x), and 3.3.[7]

---

[7] Longyear also objects to the Report and Recommendation because Judge Scott did not address its counterclaim asserting a breach of Section 2.1(v). But neither this claim, nor any factual foundation supporting the claim, is found in Longyear's pleadings. As such, it will not be considered by this Court.

Each of these objections is discussed below.

**1. § 2.1(f)(i)**

Judge Scott found issues of fact regarding the sufficiency of Alliance's disclosure. But whether the infant claim should be considered a liability at all is a threshold question that must be addressed first. See Jim Ball Chrysler LLC v. Marong Chrysler-Plymouth Inc., 17 A.D.3d 1113, 1113-14, 794 N.Y.S.2d 545 (4th Dep't 2005) ("Where there is no duty to perform, there can be no breach of contract."). If Alliance had no duty to disclose the infant claim, it is inconsequential whether it disclosed it adequately.

This is precisely what Alliance contends: it did not breach the contract because it incurred no liabilities regarding the infant's health claim. Relying on CBS Corp., v. United States, it notes that the term liability refers to a present obligation to pay either now or in the future. 90 Fed. Cl. 456, 465 (Fed. Cl. 2009). Because its stop-loss insurer paid for the infant's health claim in amounts over $50,000, Alliance argues, it had no outstanding obligation to pay either "now or in the future" – it therefore never incurred any liability and Longyear's claim should be dismissed.

Longyear contends that the infant's claim remained Alliance's liability despite Alliance's insurance coverage. It cites cases from the Third and Fourth Circuits, in the Employee Retirement Income Security Act ("ERISA") context, holding that an employer retains liability for the benefits provided in its health plan even if it purchases stop-loss insurance. See Bill Gray Enters, Inc., v. Gourley, 248 F.3d 206, 214 (3d Cir. 2001) ("By

---

(continued from previous page) See, e.g., Beckman v. U.S. Postal Serv., 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000) ("Although a complaint need not correctly plead every legal theory supporting the claim, at the very least, plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense.").

purchasing stop-loss insurance, the plan does not delegate its fiscal liabilities . . . to the insurance company"); Thompson v. Talquin Bldg. Prods., Co., 928 F.2d 649, 653 (4th Cir. 1991) ("Instead of covering employees directly, the stop-loss insurance covers the Plan itself.").

The parties' dispute essentially requires this Court to engage in contract interpretation. A court tasked with interpreting a contract should seek "to give effect to the intent of the parties as revealed by the language of their agreement." Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 157 (2d Cir. 2000) (Sotomayor, J.). In a breach-of-contract action, summary judgment is appropriate where the language of the contract is unambiguous. Photopaint Techs., LLC v. Smartlens Corp., 335 F.3d 152, 160 (2d Cir. 2003). Whether a contract is clear or ambiguous "is to be decided by the court as a matter of law." Mellon Bank, N.A. v. United Bank Corp. of N.Y., 31 F.3d 113, 115 (2d Cir. 1994). A court is justified in finding a contractual term to be ambiguous "where it may be ascribed 'conflicting reasonable interpretations.'" Rogath v. Siebenmann, 129 F.3d 261, 267 (2d Cir. 1997) (quoting Mellon Bank, N.A., 31 F.3d at 116). But it is well-settled that "[w]here . . . the meaning of an agreement among sophisticated parties is unambiguous on its face, the agreement does not become ambiguous simply because one of the parties later asserts that it intended a different interpretation." New Bank of New England, N.A. v. Toronto-Dominion Bank, 768 F. Supp. 1017, 1022 (S.D.N.Y. 1991). Further, no ambiguity exists when contract language has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself." Breed v. Ins. Co. of North Am., 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978); accord Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d

425, 428 (2d Cir. 1992).

While the parties dispute the meaning of the term liability, the contract is clear that financial statements were to be prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). In Section 2.1(f)(i) entitled "Financial Statements; No Undisclosed Liabilities," the Agreement states that "[t]he Financial Statements have been prepared from the books and records of [Prosonic] and [Prosonic] Subsidiaries in accordance with GAAP." The term "liability" has a well-defined meaning within GAAP. As explained by the court in CBS Corp.:

> The concept of 'liability' is spelled out in Statement of Financial Accounting Concepts ('SFAC') No. 6 which is published by the Financial Accounting Standards Board, which in turn establishes GAAP. SFAC No. 6 defines 'liability' to mean the 'legal, equitable, or constructive duty or responsibility' to pay an obligation. Under SFAC No. 6, liabilities are defined as 'probable future sacrifices of economic benefits arising from present obligations of a particular entity to transfer assets or provide services to other entities in the future as a result of past transactions or events.'

90 Fed. Cl at 465 (internal citations omitted).[8]

Because the term "liability" has "a definite and precise meaning," no ambiguity exists and summary judgment may be appropriate. See Breed, 46 N.Y.2d at 355; see also Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 889 (2d Cir. 1993) (summary judgment in contract dispute may be granted where the agreement's language is unambiguous).[9] Longyear, however, continues to argue that regardless of

[8] In its own footnote, the court notes that SFAC standards are considered to be a component of GAAP. CBS Corp., 90 Fed. Cl. at 645 n. 12.

[9] Both parties agree that no ambiguity exists in the Agreement.

whatever insurance Alliance might have had in place, the original and final obligation to pay for its employees' healthcare remained with Alliance. Alliance, for its part, continues to assert that it was never under an obligation to pay the infant's claim; rather, it was exclusively its insurer's duty.

Yet, Alliance's argument fails in light of its healthcare employee agreement. In its binding Summary Plan Description ("SPD"), Alliance contracted to provide health coverage to those employees who chose to enroll in the plan. (See Summary Plan Description, Docket No. 91-10); Heidgerd v. Olin Corp., 906 F.2d 903, 908 (2d Cir. 1990) (terms of SPD are controlling). The SPD explicitly states that the plan is self-funded by Alliance and that "the sole risk of loss belongs to Alliance Industries Inc." (Id., p. 1.) Thus, according to its own terms, it had the sole obligation to pay for health related claims up to $1 million. It decided to fulfill that obligation, in part, by contracting with a third-party insurer, but according to its own SPD, the obligation to pay its enrolled employees' health claims remained, primarily and finally, with Alliance.

This conclusion accords with the holdings from other courts, including the Third and Fourth Circuit. Those courts found that liability ultimately remains with the self-funded plan even if the plan chooses to cover itself with stop-loss insurance. Bill Gray Enters, Inc., 248 F.3d at 214; Talquin Bldg. Prods., Co., 928 F.2d at 653; see also In re Express Scripts Inc., PBM Litig., No. 4:02-CV-01503, 2009 WL 2952787, at *16 (E.D. Mo. July 30, 2008) ("[T]he distinction between an 'insured' plan and a 'self-funded' plan turns on liability."). These courts correctly reason that self-funded plans retain an ever-present obligation because if the insurance provider becomes insolvent, the self-funded plan must pay all heath-related costs. Accordingly, despite Alliance's stop-loss insurance, the infant's claim was

its obligation and it breached the Agreement when it represented that it had no such liability.

Despite this result, Alliance argues that the claim arose "subsequent to September 30, 2006 in the ordinary course of business, consistent with past practices," and thus falls into an exception in Section 2.1(f)(ii). But the infant was born on September 6, 2006 and although he was not enrolled in Alliance's health insurance plan until November 3, 2006, it is undisputed that the policy would be retroactive to the child's birth.

Alliance notes that it kept its books in such a manner that no expense was listed until it was incurred and that it did not incur any undocumented expense before September 30, 2006 (because the insurance policy covered all expenses over $50,000). But the manner in which they kept their books has no bearing on the date that the liability arose. According to the SPD, Alliance incurred the obligation to pay for the child's healthcare the day that the infant was born. Because that occurred before September 30, 2006, Alliance's motion on this ground is denied.

Alliance further objects to the Report and Recommendation by arguing that the Magistrate Judge failed to address its position that its motion for summary judgment should be granted because Longyear failed to establish that the alleged breach caused Defendants' damages.

Causation is an essential element in any breach-of-contract claim. Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc., No. 02 Civ. 7689, 2005 WL 832050, at *4 (S.D.N.Y. Apr. 12, 2005). Alliance argues that Longyear has not demonstrated this element because Longyear incurred the infant's medical expenses only because it negotiated an insurance policy that excluded employee dependants who, at the time the policy began, were

hospitalized. Such a policy, it argues, breaks the causal link between its breach and Longyear's damages because even if it knew the amount of liability incurred by Prosonic, it would not have known that the infant was in the hospital. It further argues that the link is broken by Longyear's failure to inquire as to how many, if any, Prosonic dependants were hospitalized on January 1, 2007. Thus, it concludes, the result would have been the same (i.e., Longyear would be liable for the infant's claim) regardless of the alleged breach.

But this argument is also without merit. As noted by Longyear, if it knew about the infant's claim it may have lowered the purchase price or cancelled the deal altogether. It may have inquired about the status of the infant and his whereabouts or well-being. This sufficiently demonstrates the causal link between Alliance's undisclosed liability and the infant's medical costs, which were unwittingly taken on by Longyear as the "natural and direct consequences of the breach." See Bennet v. U.S. Trust Co., 770 F.2d 308, 316 (2d Cir. 1986). As discussed above, the liabilities transferred from Alliance to Longyear – that the two companies had different insurance policies to cover those liabilities is of no consequence in demonstrating causality.

Next, Alliance argues it did not breach Section 2.1(f)(ii) (and that the Magistrate erred in finding issues of fact) because it provided unrestricted access to its third-party insurer – the entity that it claims possessed all the relevant documents regarding health expenses over $50,000. But this fact does not save it from Longyear's breach-of-contract claim. In the Agreement, Alliance affirmatively represented that, with several inapplicable exceptions, it had no liabilities. Therefore, Longyear's breach of contract claim is valid regardless of the amount of access Alliance provided Longyear. It made a promise, breached that promise, and thereby caused Longyear damages. This is all that is required

in a breach-of-contract claim. See Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996); see also Joseph Martin, Jr., Deli., Inc. v. Schumacher, 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981) (redress available when promisee assented to an obligation and failed to perform).

For those reasons – regarding the alleged breach of Section 2.1(f)(ii) – Alliance's motion for summary judgment is denied and Longyear's motion is granted. The Magistrate Judge's recommendation to deny both motions is set aside.

**2. § 2.1(h)**

In Section 2.1(h), Alliance represented that there was no event, occurring between Janurary 1, 2006 and December 6, 2006, that would have a material adverse effect on Prosonic. Longyear argues that the infant's claim is such a material adverse effect. But the Agreement is written such that the material adverse effect must be felt by Prosonic, not Longyear. In that sense, Alliance argues, it did not breach the Agreement because the maximum amount of liability it was subject to cannot be considered material.

Alliance's health coverage ended after an employee (and/or his dependant) reached $1 million in health claims. Because the infant had already amassed $520,000 in claims in 2006, Alliance notes that the most it could be responsible for is the remaining $480,000. It argues that such a figure is well below the Second Circuit's standard defining materiality at 5% of a company's assets. See ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 204 (2d Cir. 1999) ("ECA, Local 134"). Prosonic's value, according to the sale, was $72.5 million. Measured from the $50,000 that Prosonic actually had to pay, the infant's claim equals .069% of Prosonic's value. Measured from the full $480,000, the claim still accounts for less than 1% of the company's value.

Longyear's response is twofold. First, it argues that, per the Agreement's "materiality scrape," the words "material adverse effect" must be read out of the contract. (See Agreement, § 6.4(d).) Alternatively, it argues the claim is material because, measured from Prosonic's 2007 net income ($3,473,836) and using the total amount of the infant's claim ($2.9 million), the claim amounted to 83.5% of Prosonic's income. Using the $480,000 figure, the claim still represents 14% of the projected income.

Regarding Longyear first response, reading the Agreement as it is written renders § 2.1 unintelligible. Removing the words "material adverse effect" from that Section leaves only this language: "there has not occurred any event or series of events, and there are not facts or circumstances in existence which would have [ ] on the Company." As noted by Alliance, it is impossible to give meaning to both Section 2.1(h) and Section 6.4. Because it is undisputed that this language was drafted by Longyear, the ambiguity created by this clause should be construed against it. See Mastrobuono v. Shearson Lehman Hutton, 514 U.S. 52, 62-63, 115 S. Ct. 1212, 131 L. Ed. 2d 76 (1995) (elaborating on common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it); see also Restatement (Second) of Contracts § 206 (1979). As such, this Court will read Section 2.1(h) as it is written and disregard the "materiality scrape" in Section 6.4.

So construed, it is still unclear whether the infant's claim had a material adverse effect on Prosonic. Alliance argues that the Second Circuit has set forth a 5% threshold for determining materiality. See ECA, Local 134, 553 F.3d at 204 (discussing the 5% numerical threshold as a good starting place for assessing the materiality of the alleged misstatement in a securities fraud suit); see also Ganino v. Citizens Utils. Co., 228 F.3d

154 (2d Cir. 2000). But those cases were decided in the context of a securities fraud claim, not a breach-of-contract claim.

These cases are further distinguishable. In ECA, Local 134, the Second Circuit noted that "this preliminary inquiry under the quantitative factor *must be supplemented*" with a qualitative inquiry. 553 F.3d at 204 (emphasis added). But the parties make no argument concerning "qualitative" factors, perhaps because these factors derive from the inapplicable Securities and Exchange Commission's Rules and Regulations. See Ganino, 228 F.3d at 16 (referencing the factors' origin).

Even assuming, *arguendo*, that these cases are controlling in this context, neither party applies them properly. In ECA, Local 134, the court found that a misrepresentation affecting less than one-third of a percent of a company's *total business assets* was not material. 553 F.3d at 204. Here, neither party has presented a calculation using Prosonic's "total assets" as the benchmark from which to compare the financial effect of the infant's claim. Instead, providing no authority for their preferred calculations, Longyear uses Prosonic's projected 2007 income as the benchmark for its calculations. It finds that the effect of the infant's claim is far greater than 5% of the projected income. Meanwhile, using Prosonic's "Enterprise Value" or purchase price as the comparison point, Alliance finds that Prosonic's liability would be far below 5% of $72.5 million (the Prosonic purchase price).

Without persuasive authority and relevant argument on point, this Court will not rule as a matter of law, in either parties' favor, that the effect of the infant's claim was "materially adverse" to Prosonic's bottom line. Accordingly, both motions are denied on this claim.

**3. § 2.1(j)(i)-(vi)**

Longyear argues that Alliance failed to disclose actuarial reports, audit reports, and benefit plans in violation of Section 2.1(j)(i)-(vi). Longyear attempts to demonstrate that Alliance violated this clause simply because it had information pertaining to the infant's claim. But the plain language of the Agreement limits Alliance's duty to provide "the most recent financial annual report, if any, and audit report, if any . . . [and] benefit plans." (Agreement, § 2.1(j)(i)-(vi). Longyear does not demonstrate that any undisclosed reports existed and the evidence establishes that Alliance provided Longyear with the health benefit plan. As such, Alliance's motion on this counterclaim is granted and Longyear's motion is denied.

**4. § 2.1(x)**

In Section 2.1(x), Alliance covenanted that none of its representations and warranties contained any untrue statement of material fact. Because this Court has found that Alliance breached Section 2.1(f)(ii), which is categorized as a "Representation and Warranty," it follows that Alliance breached Section 2.1(x). Longyear's motion on this counterclaim is therefore granted and Alliance's is denied.

**5. § 3.3**

Longyear alleges that Alliance breached Section 3.3. Judge Scott did not specifically address this allegation and Longyear did not object to that omission. However, Judge Scott generally denied both motions for summary judgment regarding all breach of contract claims. (See Report and Recommendation, p. 19.) To the extent the Magistrate denied Alliance's motion regarding this claim, that recommendation is set aside.

Section 3.3 is a "further assurances" clause, essentially requiring each party to execute the documents necessary to consummate the transaction. See In re Exide Tech., 607 F.3d 957, 964 (3d Cir. 2010) (applying New York law); Pan Am. World Airways, Inc. v. Eclipse Holdings, Inc., No. 95 Civ. 2763, 1998 WL 205313, at *3-*4, (S.D.N.Y Apr. 27, 1998). Because Longyear has made no allegation that Alliance failed to execute any necessary documents to consummate the acquisition (which was effectuated), Alliance's motion is granted regarding this counterclaim.[10]

**D. Review of the Report and Recommendation: Breach of Contract – Tax Counter claims**

Longyear moves for summary judgment regarding its claim that Alliance breached the Agreement by failing to pay for Prosonic's pre-closing tax liabilities as set out in the Agreement. Alliance opposes this motion (but does not separately move for summary judgment), arguing that factual issues preclude summary judgment.

Section 8.1 of the Agreement requires Alliance to pay for Prosonic's pre-closing tax liability. Section 8.4 of the Agreement indicates that no delay on the part of Longyear to notify Alliance of a tax claim will relieve Alliance of its duty to pay unless it results in a prejudice to Alliance. Thus, even if there were a notice delay (which is disputed), if Alliance suffered no prejudice, the tax claim would still be its responsibility. It opposes summary judgment, however, by arguing that Longyear has not demonstrated that it was not prejudiced.

Judge Scott denied Longyear's motion, finding questions of fact regarding notice

[10]Longyear does not even raise any arguments that Alliance breached Section 3.3 in its Memorandum in Support of its Motion for Summary Judgment. (Undocketed; maintained in paper form only.)

and prejudice. (See Report and Recommendation, p. 22.) For the following reasons, that recommendation is set aside.

As noted, in its memorandum opposing Longyear's motion for summary judgment (Docket No. 101), Alliance rests its opposition on its proposition that Longyear has not proven that Alliance suffered no prejudice. But Longyear did make such a showing. Initially Longyear notes that John Walsh, as Alliance's corporate designee, could point to only two possible causes of prejudice due to Longyear's delay in notifying it of a tax audit: (1) the accrual of interest and (2) the expiration of the time period allowing Alliance to intervene in the audit. This is undisputed by Alliance. But in response, Longyear presents evidence that Alliance could not have been prejudiced due to either of these proffered reasons. It notes that it paid an initial sum of $376,207.76 to the State of Florida, precisely to avoid interest and penalties. It also notes that it is undisputed that at the time Longyear notified Alliance about the tax audit, the audit remained contestable and Alliance chose not to defend the charges therein. (Def's State., ¶ 165.)

Alliance offers no argument, nor points to any facts to refute these claims; instead it simply relies on case law indicating that prejudice is "generally" a question of fact. But once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (internal citations omitted). Moreover, while "weighing evidence and drawing legitimate inferences from facts are functions that the court must leave to the jury, if the nonmoving party does not present evidence from which a reasonable jury could return a favorable verdict, then summary

judgment is appropriate." Phoenix Warehouse of Cal., LLC v. Townley, Inc., No. 8 Civ. 2856, 2011 WL 2421295, at *3 (S.D.N.Y. June 7, 2011); see also Anderson, 477 U.S. at 249 (summary judgment appropriate unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"). Accordingly, without evidence demonstrating that it was prejudiced, and in light of Longyear's evidence to the contrary, Alliance cannot withstand summary judgment. See BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir. 1996) ("The party opposing the motion for summary judgment must set forth concrete particulars. It is not sufficient merely to assert a conclusion without supplying supporting arguments or facts.") (Internal citations and modifications omitted). Longyear's motion on this counterclaim is therefore granted and the Report and Recommendation is set aside.

**E. Review of the Report and Recommendation: Tort Counterclaims**[11]

Longyear also brings fraudulent concealment, fraudulent misrepresentation, and negligent misrepresentation claims.

New York law recognizes a tort duty to disclose by a party in a business transaction in three situations: (1) where a fiduciary relationship exists; (2) where one party has made a partial or ambiguous statement; and (3) where a party possess superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge. See Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993). The last situation is sometimes referred to as the "special facts" doctrine. Swersky v. Dreyer &

---

[11] While the Agreement specifies that contract claims will be governed by New York law, no similar provision exists for tort claims. The Magistrate Judge found that either New York or Ohio law should apply – that finding was not objected to and therefore this issue will not be revisited here. See Ianniello, 2012 WL 314872, at *1. Ohio law is similar to New York law in this regard, except that Ohio law does not recognize the "special facts" doctrine.

Traub, 219 A.D.2d 321, 327, 643 N.Y.S.2d 33 (1st Dep't 1996).

Judge Scott found that no fiduciary or special relationship existed between the parties and that any alleged non-disclosure was "not necessarily material." (Report and Recommendation, p. 20.) As such, under either New York or Ohio law, the Magistrate Judge recommended that Alliance's motion for summary judgment be granted on these claims.

Longyear does not object to the finding that no fiduciary relationship existed,[12] but finds fault with Judge Scott's conclusion regarding the second and third factors listed above. Although this Court takes no position on the materiality of the alleged non-disclosure, it concurs with Judge Scott's conclusion.

Longyear has failed to establish that either of these grounds should be invoked or that, even if Alliance had a tort duty, it acted fraudulently. The "partial statement" doctrine rests on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth. See Brass, 987 F.2d at 150 (citing Junius Const. Co. v. Cohen, 257 N.Y. 393, 178 N.E. 672 (1931)). Longyear argues that this rarely-employed doctrine is applicable because Alliance disclosed some claims over $50,000, but not the infant's. Yet, simply put, this is not a case where a party disclosed only part of a relevant fact. Further, Longyear points to no evidence suggesting that Alliance intended to defraud Longyear. Contrarily, it is undisputed that Alliance provided unfettered access to its insurer's records, where details on the infant's claim could have been found. This fact

[12]This type of relationship must exist to sustain a negligent representation claim in the context of a commercial transaction. See Kimmell v. Schaefer, 89 N.Y.2d 257, 263, 675 N.E.2d 450, 652 N.Y.S.2d 715 (1996). This Court therefore adopts the Magistrate Judge's recommendation dismissing the negligent misrepresentation claim.

also precludes Longyear's reliance on the "special facts" doctrine because the information was readily available to Longyear. See Brass, 987 F.2d at 150.

Having failed to establish that Alliance owed Longyear an independent tort duty and having provided no evidence that Alliance acted fraudulently, Alliance's motion for summary judgment seeking dismissal of Longyear's tort claims is granted. The Report and Recommendation is therefore adopted as to its conclusion that the tort and associated punitive damages counterclaims should be dismissed.

### F. Attorney Fees

Longyear seeks attorney fees for prosecuting this action and the tax audit. If it chooses to proceed with this claim, it shall file a motion detailing its request, thereby allowing Alliance to respond.

## IV. CONCLUSION

For the reasons discussed above, the Report and Recommendation is set aside in part and adopted in part. Each party's motions for summary judgment are also denied in part and granted in part.

## V. ORDERS

IT HEREBY IS ORDERED, that Judge Scott's Report and Recommendation (Docket No. 112) is ADOPTED in part and SET ASIDE in part.

FURTHER, that Defendant's Motion for Summary Judgment (Docket No. 95) is GRANTED with respect to its first, fourth, and tenth counterclaims and with respect to each of Plaintiff's claims. It is DENIED in all other respects.

FURTHER, that Plaintiff's Motion for Summary Judgment (Docket No. 84) is

DENIED as moot.

FURTHER, that Plaintiff's Amended Motion for Summary Judgment (Docket No. 88) is DENIED with respect to its claims and GRANTED with respect to Defendant's counterclaims except for Defendant's first, second, fourth, and sixth counterclaims, for which the Motion is DENIED.[13]

FURTHER, that Defendant's motion detailing its requested fees, with accompanying memorandum if necessary, if it chooses to so file, must be filed by April 23, 2012. Plaintiff's response is due May 10, 2012. Defendant's reply is due May 21, 2012.

SO ORDERED.

Dated: February 26, 2012
Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court

[13] Alliance did not move for summary judgment regarding the tax dispute, reflected in counterclaims ten and eleven.